T.C. Memo. 2006-276


UNITED STATES TAX COURT


GREAT PLAINS GASIFICATION ASSOCIATES, A PARTNERSHIP, TRANSCO COAL
GAS COMPANY, A PARTNER OTHER THAN THE TAX MATTERS PARTNER,
Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 10578-01.                    Filed December 27, 2006.


<u>H. Karl Zeswitz, Jr.</u>, <u>Kent L. Jones</u>, and <u>Mary E. Monahan</u>,

for petitioner.[1]

<u>Derek B. Matta</u>, <u>David Q. Cao</u>, <u>John F. Eiman</u>, and <u>Elizabeth</u>

<u>Girafalco Chirich</u>, for respondent.

---

[1] The petition was signed by petitioner's counsel, F. Brook
Voght, who died on Sept. 16, 2003.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, Judge:  This is a partnership-level proceeding subject to the unified audit and litigation procedures of sections 6221 through 6231.[2]

In the 1970s, reacting to a global energy crisis, the Federal Government reached out to private industry to help develop alternative energy sources, including synthetic fuels. In response, five major energy companies, through their subsidiaries, formed a partnership, Great Plains Gasification Associates (the partnership), to develop, construct, own, and operate a project to produce natural gas from coal (the project). The partnership financed the project with about one-half billion dollars of the partners' equity contributions and a $1.5 billion loan (the loan) from the Federal Financing Bank (FFB).  The loan was secured by a mortgage on the partnership's assets and guaranteed by the U.S. Department of Energy (DOE).  The parent

---

[2] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

The tax matters partner for Great Plains Gasification Associates (the partnership) is ANR Gasification Properties Co. (ANR).  The tax matters partner for the partnership did not file a petition for readjustment of partnership items.  Transco Coal Gas Co. (Transco), a partner of the partnership other than the tax matters partner, satisfies the requirements of sec. 6226(b) and (d) and timely filed the petition on behalf of the partnership and Transco.

corporation of one of the partnership's general partners pledged certain stock as security for DOE's loan guarantee.

The partnership built the coal gasification plant in Mercer County, North Dakota, near available coal reserves. Upon its completion in 1984, the project was the only commercial-scale operation of its type in the United States.

From an engineering perspective, the project was successful, employing innovative catalytic processes to convert low-grade, low-value lignite coal into high-Btu (British thermal units) pipeline-quality synthetic natural gas. The plant achieved average daily production of 125,000 mcf (thousand cubic feet). It remains in production today.

Economically, however, the project was less successful. As construction neared completion, energy prices dropped. Anticipated initial losses from the project rose. Anticipated cashflows fell. In 1985, the partnership defaulted on the DOE-guaranteed loan. Pursuant to the guarantee agreement, DOE paid off the loan; by subrogation, the partnership's debt shifted from FFB to DOE. In a June 30, 1986, foreclosure sale, DOE bid $1 billion for the partnership's mortgaged assets, effectively reducing the partnership's outstanding $1.57 billion liability by $1 billion in exchange for the mortgaged project assets.[3]

---

[3] In October 1988, the U.S. Department of Energy (DOE) released the partnership's remaining debt when it took possession
(continued...)

The partnership unsuccessfully contested the foreclosure proceedings in litigation which concluded in November 2, 1987, when the U.S. Supreme Court denied the petition for writ of certiorari. For Federal income tax purposes, the partnership reported disposing of the project assets as of that date.

By four separate notices of final partnership administrative adjustments (FPAA), respondent took alternative "whipsaw" positions, determining that the partnership had engaged in a sale or exchange of the plant and related assets as of various dates in 1985, 1986, 1987, and 1988. Respondent determined that, as of these various alternative dates, the partners must recapture previously claimed investment and energy tax credits, forfeit certain deductions and losses relating to the project, and recognize gain from disposition of project assets.

The primary issue for decision is whether for Federal income tax purposes the partnership should be treated as disposing of the project assets before November 2, 1987. We must also decide whether the partnership must take into account the full $1.57 billion debt in the year in which the partnership disposed of the project assets pursuant to the foreclosure sale.

---

[3](...continued)
of the stock that one partner's parent company had pledged as security for the loan guarantee.

FINDINGS OF FACT

When the petition was filed, the partnership's principal place of business was in Houston, Texas.[4]

Evolution of the Great Plains Project

In the 1970s, natural gas shortages were widespread. Energy companies began investigating new supply sources. One idea was to use abundant domestic coal reserves to produce synthetic natural gas in a process known as coal gasification.

American Natural Resources Co. (ANRC), operated two natural gas distribution companies and two natural gas pipelines, in addition to conducting oil and gas exploration. It also owned rights in extensive coal reserves in North Dakota. ANRC had studied the possibility of building a coal gasification plant near these coal reserves. (This project would later become known as Great Plains.) By the mid-1970s, ANRC was working on coal gasification technologies and discussing the potential project with Government officials.

Outside the United States, some coal gasification projects were already operational, but existing technologies allowed coal to be converted only into 500 Btu gas. United States pipelines, by contrast, required 1,000 Btu gas. ANRC, as well as other domestic energy companies, contemplated a project that would be

---

[4] The parties have stipulated that pursuant to sec. 7482(b) venue lies in the U.S. Court of Appeals for the Fifth Circuit.

the first of its kind, employing new, still unproven technologies to convert domestic coal into pipeline-quality natural gas.

DOE actively supported the project, which appeared to hold great promise as an alternative energy source.[5]  Mr. Jack O'Leary, who was then Deputy Secretary of Energy, encouraged several interstate pipeline companies to form a consortium to raise money for the Great Plains project.  Ultimately, five interstate pipeline companies agreed to form a partnership (through their subsidiaries) to design, build, and operate the plant.  In addition to ANRC, these companies were Transco Energy Co. (Transco Energy), Tenneco, Inc., Pacific Lighting Co., and MidCon Corp.

The Partnership

The partnership, Great Plains Gasification Associates, was formed in 1978 under North Dakota law.  The five general partners were wholly owned subsidiaries of the just-named pipeline companies, with ownership percentages in the partnership as follows:

---

[5] Ultimately, DOE viewed the project as a "demonstration program" within the meaning of sec. 207 of Title II of the Department of Energy Act of 1978--Civilian Applications, Pub. L. 95-238, 92 Stat. 61, to produce alternative fuels from coal and other domestic resources and to provide technical and environmental knowledge to assess the long-term viability of synthetic fuel production in the United States.

|                                          | Ownership<br>Percentage |
| ---------------------------------------- | --------- |
| Partner                                  |           |
| Tenneco SNG, Inc. (Tenneco)              | 30        |
| ANR Gasification Properties Co. (ANR)    | 25        |
| Transco Coal Gas Co. (Transco)           | 20        |
| MCN Coal Gasification Co. (MidCon)       | 15        |
| Pacific Synthetic Fuel Co. (Pacific)     | 10        |

The partners executed an Amended and Restated General Partnership Agreement as of June 1, 1981 (partnership agreement), in which the partnership assumed responsibility for the Great Plains project.  Pursuant to the partnership agreement, the partnership's management committee, composed of one representative of each partner, had exclusive authority and full discretion to manage the partnership's business.  No partner had authority to act for, or assume any obligation or responsibility on behalf of, the partnership without the management committee's prior approval.  The management committee was authorized to act either upon the approval, vote, or "consent" of partners holding at least 65 percent of the total votes, which were allocated according to partners' ownership percentages.  The partnership agreement provided that it was governed by North Dakota law.

Pursuant to the partnership agreement, the partnership was not permitted to acquire assets or incur liabilities until the date when it acquired various preexisting project assets from individual partners.  After this date, the plant site and all property acquired by the partnership to construct, operate, and maintain the plant were to be the property of the partnership.

Each partner was obligated to make cash contributions upon notice from the management committee, as necessary to purchase the preexisting project assets from other partners, to pay project costs, and to pay costs incurred by the partnership. The partners were prohibited from making voluntary contributions to the partnership.

Funding for the Project

The partnership funded the Great Plains project from two sources: (1) About $550 million of equity contributions from the partners; and (2) a loan of about $1.5 billion provided under a credit agreement with FFB (the credit agreement) and guaranteed by DOE.

Partners' Equity Contributions

The partners were required to contribute to the partnership $1 of equity for every $3 borrowed under the credit agreement.[6] Upon the occurrence of various specified events, the partners could terminate their participation in the project after giving the DOE Secretary at least 14 days' advance notice and a chance to discuss the matter with the partners' representatives.[7] After

---

[6] Pursuant to an equity funding agreement, each partner's parent agreed to provide funds to its respective subsidiary as necessary for the partner to make the required equity contributions.

[7] In general, partners were entitled to terminate participation in the project at any time prior to the in-service date if projected gross revenues from the project fell below

(continued...)

terminating their participation pursuant to these provisions, the partners would have no obligation to continue making equity contributions.

The partners' equity contributions to the partnership ultimately totaled about $550 million.

The Credit Agreement

Pursuant to the credit agreement dated January 29, 1982, FFB committed to lend the partnership up to $2.02 billion for the design, construction, and startup of the project. The credit agreement provided that if the partnership defaulted on the payment of principal or interest, FFB should demand payment of the partnership and provide notice of the default to DOE. If the partnership or DOE failed to cure the default within 5 days, FFB could terminate the credit agreement and declare the entire outstanding debt due and demand payment by DOE pursuant to DOE's loan guarantee (discussed below). Pursuant to the credit agreement, FFB agreed that "any recovery on a claim against Borrower [the partnership] or any Partner which may arise under

---

[7](...continued)
certain levels; if estimated costs exceeded certain levels; if the estimated in-service date slipped past June 1, 1986; if there were no longer "reasonable assurance" that the project would generate sufficient cash to permit the partnership to service its debts and repay the partners' equity contributions; or if DOE gave the partnership notice that DOE had determined that there was no longer reasonable assurance that the partnership would be able to timely pay principal and interest on the guaranteed indebtedness.

this Agreement * * * shall be limited to the assets of the Borrower and such Partner's interests in such assets".

### Loan Guarantee Agreement

Pursuant to a loan guarantee agreement, also dated January 29, 1982, DOE agreed to guarantee the entire amount of principal and interest on the debt incurred by the partnership under the credit agreement.[8] DOE's guarantee was based on its determination that the guarantee was necessary to encourage the partners' financial participation in the project.

Pursuant to the loan guarantee agreement, FFB was to make no disbursements to the partnership until DOE reviewed and authorized the proposed disbursements. DOE retained the right, under specified circumstances, to terminate the Government's participation in guaranteeing additional disbursements for the project. Pursuant to the loan guarantee agreement, if the partnership failed to pay FFB principal or interest on the indebtedness when due, the Secretary was authorized to cause the principal amount of all the guaranteed indebtedness, with accrued interest, to become due and payable from the partnership. If the partnership failed to cure the default, the Secretary, upon payment of the indebtedness to FFB, was authorized to take action

---

[8] DOE was granted authority to guarantee the partnership's debt pursuant to the Federal Nonnuclear Energy Research and Development Act of 1974, Pub. L. 93-577, 88 Stat. 1878, as amended by the Department of Energy Act of 1978, Pub. L. 95-238, 92 Stat. 47.

to enforce the partnership's obligations under the guarantee agreement.

Pursuant to the loan guarantee agreement, DOE agreed that its recovery on any claim against the partnership or any partner would generally be limited to the partnership's assets and to the partners' interests in those assets. The partnership agreed, "To the full extent permitted by applicable law," to waive the benefit of any redemption law that might otherwise have been applicable to any right under this agreement. The loan guarantee agreement states that it "shall be governed by and construed and interpreted in accordance with the federal laws of the United States. It is the intent of the United States to preempt any state law conflicting with the provisions of this Agreement".

Pursuant to the loan guarantee agreement, the partnership was prohibited from engaging in any business other than the project. All proceeds from the guaranteed debt were required to be promptly applied to fund costs that were necessary, reasonable, and directly related to the design, construction, and startup of the project facilities.

### Indenture of Mortgage

The credit agreement and the loan guarantee agreement were secured by an Indenture of Mortgage and Security Agreement dated January 15, 1982, between the partnership, as debtor and mortgagor, and Citibank, N.A. (trustee), as trustee and

mortgagee, acting in a fiduciary capacity for the benefit of the United States and FFB. Property subject to the mortgage included real estate owned by the partnership; plants, facilities, and buildings owned by the partnership or leased by the partnership; the partnership's rights to and under certain contracts (including gas purchase agreements, the project administration agreement, and the coal purchase agreement, all of which are discussed infra); and all other real or personal property "now owned or hereafter acquired by Borrower".

Pursuant to the mortgage, an "event of default" would include termination in the project by any two or more partners and the partnership's failure to make timely principal or interest payments. In the event of a default, the trustee was entitled to take possession of the mortgaged property without legal process, operate the mortgaged property, receive all income from the operation, pay all expenses, and proceed to sell the mortgaged property in foreclosure proceedings. The United States was authorized to bid on and purchase the mortgaged property. Sale proceeds were to be applied first to paying any interest and principal then due on the note and then to repaying all amounts paid by the United States pursuant to the guarantee. The mortgage provided that the partnership agreed, "To the full extent it may legally do so", to waive "any and all rights of redemption from sale under order or decree of foreclosure of this

Mortgage". The mortgage stated that it "shall be governed by and construed and interpreted in accordance with" Federal law.

### Pledge of ANG Stock

ANRC's wholly owned subsidiary, ANG Coal Gasification Co. (ANG), was formed in the early stages of the project to design and manage construction of the project and to operate the project after its completion. ANG held certain contractual and other rights and permits relating to the project. As a precondition for the loan guarantee agreement, DOE required ANRC to pledge its ANG stock as additional security for the partnership's obligations under the loan guarantee agreement. Pursuant to the ANG stock pledge agreement, dated January 29, 1982, if the partnership defaulted on its debt, the DOE secretary was authorized to take possession of the ANG stock certificates and sell the ANG stock to such persons, including himself, as he deemed expedient, applying the sale proceeds against the partnership's debt.

### ANG Operates the Plant

Under the project administration agreement, dated January 29, 1982, the partnership appointed ANG as the partnership's agent to administer the project's construction, startup, and operation. As project administrator, ANG was responsible for the design, construction, and operation of the gasification plant and coal mine on behalf of the partnership. Pursuant to an agreement

between ANG and DOE, dated January 29, 1982 (the project administration agreement), if the partnership defaulted on its obligations under the loan documents, ANG would, at the DOE Secretary's option, continue to act as administrator of the Great Plains project.

In connection with the project administration agreement, ANG and the partnership entered into a coal purchase agreement to provide a source of lignite coal for the project. The agreement was based upon coal rights previously obtained by ANG to buy and receive from a third party sufficient coal to satisfy the project's requirements. ANG agreed to deliver for the partnership's account sufficient coal to support the plant's operation.

ANG served as the project's sole operator until October 1988. After production commenced at Great Plains in 1984, ANG had 800 to 1,200 full-time workers on site at the project.

Partnership Enters Gas Purchase Agreements With Pipeline Affiliates

On January 29, 1982, the partnership entered into 25-year gas purchase agreements with pipeline companies affiliated with four of the partners (the pipeline affiliates). The gas purchase agreements provided that, after the project's in-service date, the partnership was obligated to tender to the pipeline affiliates all synthetic natural gas produced by the project, and the pipeline affiliates were collectively obligated to purchase

all this gas at specified prices or else to pay for gas tendered but not taken.[9]

## Plant Is Built and Begins Operation

Construction of the project began in 1981. The project was placed in service for tax purposes in 1984. On July 28, 1984, the plant delivered its first synthetic natural gas to the interconnecting gas pipeline. Since then, the plant has continuously produced and delivered synthetic natural gas.

## Initial Eligibility for Investment and Energy Tax Credits

A substantial part of the project's assets constituted new section 38 property, qualifying for general business credits (sometimes referred to as investment credits). In addition, a substantial part of the project's assets constituted alternative energy property within the meaning of section 48(l)(3) and constituted energy property eligible for the energy percentage under section 46(b)(2)(A). The partners and DOE relied on the availability of the investment and energy tax credits as a key

---

[9] These contracts obligated the pipeline affiliates to a payment rate substantially above the market price for the gas produced; the price was to be reduced in periodic increments over a 25-year period. Economic analyses indicated to the partnership that the gas purchase agreements would result in an assured market for the synthetic natural gas produced during the project's life and that revenues would be adequate to service the debt and also contribute toward the return of invested equity. By separate agreement, in the event a default by the partnership led to the termination of the gas purchase agreements, those agreements could be reinstated between the pipeline affiliates and DOE on the same terms.

consideration in structuring the financial terms of the project and in deciding to pursue the project.

In 1982, the partnership requested an IRS ruling that the partnership's DOE-guaranteed loan from FFB would not be considered "subsidized energy financing" under section 48(l)(11)(C). In a private letter ruling dated May 8, 1984, the IRS ruled that, because the partnership was required to obtain financing through FFB as a condition to obtaining a loan guarantee from the DOE, the funds that the partnership borrowed from FFB did not constitute subsidized energy financing under section 48(l)(11)(C).[10]

Financial Difficulties With the Project

In the mid-1980s, as construction of the Great Plains project neared completion, energy prices declined unexpectedly and precipitously. As a result, projected initial short-term losses from the project spiked; there was no longer reasonable assurance that the project would generate sufficient cash for the partnership to repay its debt to FFB on time. Nevertheless, the

---

[10] In response to a subsequent ruling request by the partnership, the IRS ruled in a private letter ruling dated July 25, 1984 (supplemented by letter rulings dated Feb. 12 and Mar. 11, 1985), that the partnership met the requirements for the credit for fuel production from nonconventional sources under sec. 29 (formerly sec. 44D). Because energy tax credits offset the sec. 29 credits in full, however, the partnership and its partners realized no tax benefit from the sec. 29 tax credits.

project remained an important part of the partners' business plans.

On March 25, 1983, the partnership advised DOE that changing economic conditions required changes in the project's financial structure. The same day, each partner notified DOE that it believed that conditions existed that would permit it to vote to terminate participation in the project pursuant to the partners consent and agreement, but that it did not presently intend to exercise this right.

Debt Restructuring Negotiations

In 1983, the partnership's representatives began meeting with officials of DOE and the Synthetic Fuels Corp. (SFC) to negotiate additional financial assistance for the project. On September 13, 1983, the partnership applied to SFC for interim price supports for the synthetic natural gas to be produced by the project. The partnership advised SFC that interim price supports would make possible the plant's completion and operation. Plant construction was then 72 percent complete and on schedule. Approximately $1.2 billion had been invested in the project: $383 million represented the partners' equity capital; the balance was FFB debt guaranteed by DOE.

Negotiations between the partnership and SFC over price supports dragged on until July 1985. In the meantime, DOE--which was monitoring the SFC negotiations--began contingency plans with

respect to the loan guarantee arrangement. DOE was especially concerned about how the project would be funded if the partners terminated participation. DOE lacked appropriated funds to complete the project on its own. In October 1983, DOE Assistant Secretary Jan Mares gave congressional testimony in which he expressed DOE's support for the price-support negotiations between the partnership and SFC as part of a loan restructuring to ensure the partners' continued participation in the project.

Discussions Concerning Terminating Participation in the Project

On the heels of this congressional testimony, SFC issued a statement deferring any decision on price support assistance for the project, citing concerns that additional legislation might be required for that purpose. The partners then advised DOE that, because the partnership lacked assurance that SFC would negotiate expeditiously for price guarantees, the partnership felt compelled to initiate procedures under the loan guarantee agreement to terminate the partners' participation in the project.

Consequently, on November 18, 1983, the partnership notified DOE that the management committee was considering a determination by the partners to terminate participation in the project. Each partner provided written notice to DOE, pursuant to the loan documents, that it believed conditions existed permitting the partner to vote to terminate participation in the project because

the project, as it was then structured, would generate insufficient cash to meet the partnership's obligations under the credit agreement and to enable the partners to recoup their equity contributions. Upon receiving these notices, DOE publicly expressed optimism that the project would represent a "valuable national asset for the long-term energy security of this country". DOE also expressed willingness to continue disbursing guaranteed funds so long as the partners continued financing their portion of the project.

Partners and SFC Sign Letter of Intent

On April 26, 1984, SFC and the partnership reached a tentative agreement, memorialized by a letter of intent. SFC proposed to provide the partnership up to $790 million of financial assistance under a price guarantee agreement. In return, pursuant to a profit-sharing arrangement, the partnership would eventually pay SFC $1.58 billion out of the project's operating profits, after first paying the entire amount of the DOE-guaranteed debt. In addition, under the tentative agreement, the partners would reinvest in the project the dollar equivalent of all tax benefits and profits obtained by the partnership for the next 3-1/2 years; this provision would have amounted to an additional equity contribution by the partners of about $690

million.[11]  The parties agreed to recommend that SFC's board and the partnership's management committee approve this tentative price guarantee agreement.

In July 1984, while negotiations continued between the partners and SFC, the gasification plant began producing synthetic natural gas.

In January 1985, the partnership received from SFC a draft price agreement; a draft loan agreement was expected soon thereafter.  To enable the partnership to meet its obligations under the loan guarantee obligation, the management committee called, at monthly intervals, for additional equity contributions of $4 million in February 1985, of $6 million in March 1985, of $3 million in April 1985, and of $1 million in May and June 1985. These additional equity contributions were based on the partners' expectation that support for the project would be forthcoming and their belief that the arrangement would be supported by DOE.

Bolstering that belief, in April 1985 DOE Assistant Secretary Mares appeared before SFC's board of directors on behalf of newly named DOE Secretary John Herrington.  Mr. Mares endorsed the understandings reached by SFC and the partnership.

_____

[11] A Comptroller General's report to Congress on the status of the Great Plains project as of Dec. 31, 1984, noted that over the project's life, the partners would realize a lower rate of return on their equity investments even with the $790 million price support arrangement because of the partners' additional equity contributions, accelerated debt repayment, and the profit-sharing arrangement.

He urged the SFC board to move quickly to conclude the price assistance agreement with the partnership. Similarly, in a May 21, 1985, letter to SFC, DOE Secretary Herrington also supported an SFC assistance agreement; he urged that any support agreement should ensure the long-term operation of the plant. By letter dated May 22, 1985, SFC Chairman Edward Noble responded that to ensure the long-term operation of the plant, DOE should restructure the debt repayment schedule. Mr. Noble requested further response from DOE before committing to final negotiations with the partnership.

Also on May 22, 1985, DOE Assistant Secretary Mares gave congressional testimony, describing the need for the price guarantee assistance agreement. He testified that DOE believed that, if SFC provided the intended financial assistance for the project, the sponsors would be able to continue operating the project beyond the year 2000. He testified that, in the event of foreclosure on the project assets, the partnership would be entitled by North Dakota law to a 1-year redemption period and would be entitled to possession of the property and to its rents and profits during that time. He testified that under North Dakota law, although the partnership may have voluntarily waived those rights in the loan documents, contracts in restraint of the right of redemption are void and unenforceable.

The Standstill Agreement

As of June 24, 1985, the partnership's outstanding balance on its FFB loans was approximately $1.446 billion. An interest payment of over $70 million and a principal payment of $328.5 million were payable to FFB on July 1, 1985. A guarantee fee of $7.684 million was also payable to DOE on July 31, 1985.

To finalize the price support agreement, SFC required approval from the Treasury Department, the Office of Management and Budget, and DOE. Because SFC needed time to obtain these approvals, and the partners were approaching a date when they would have to make substantial payments under the loan documents, the parties negotiated a "standstill agreement". Under the standstill agreement, dated June 24, 1985, the partnership's due date for interest, principal, and the guarantee fee payments was extended to August 1, 1985.[12]

The standstill agreement also required the partners to withdraw their November 18, 1983, notices of consideration of termination of participation and to continue diligently to complete construction of the project, making timely equity investments into the partnership. Addressing the possibility

---

[12] Under the standstill agreement, the parties agreed that the in-service date would occur at the close of business on Aug. 1, 1985. The determination of the in-service date was of key importance to the Government, because the pipelines' obligation to take or pay for all gas produced from the plant became fixed upon the in-service date.

that the partners could still terminate participation under the partners consent and agreement, the standstill agreement provided that the partners could furnish notice of termination of participation prior to noon on August 1, 1985, in which event termination would be effective as of that date.  A notice of termination pursuant to this provision would relieve the partners of the obligation to make further equity contributions to the partnership.

Partnership and SFC Reach Price Support Agreement

On July 16, 1985, the partnership reached a final agreement with SFC for a $720 million price guarantee.[13]  The agreement required the DOE Secretary's approval.  It was not forthcoming.

DOE's Rejection of Price Support Agreement

Notwithstanding DOE's prior public support for the Great Plains project and a price guarantee agreement, DOE rejected the final agreement between SFC and the partnership in a 2-page letter, dated July 30, 1985, and signed by DOE Secretary

---

[13] Pursuant to this price guarantee assistance agreement, on Aug. 1, 1985, the partnership would "default" on the payments due FFB under the standstill agreement, and DOE would use an existing $673 million reserve to "cure" that default on behalf of the partnership; repayment of the remaining FFB indebtedness would be rescheduled so that no significant burden for mandatory principal payments would be incurred earlier than 1996; price guarantees would be available.  Under this agreement, 80 percent of the cashflow would be used to repay the DOE-guaranteed debt, and after that debt was repaid, SFC would be paid.  Partners were to make an additional equity investment of $190 million in the project.

Herrington. Acknowledging that this action was not the fault of the project sponsors or SFC, this letter stated summarily that the package "would not be in the best interests of the Nation as a whole" and that DOE would not support the agreement "as currently constituted".

Partners Terminate Participation in the Project

On August 1, 1985, the partners learned of DOE's rejection of the financial assistance arrangement. The partners were surprised and disappointed; they felt that DOE had doublecrossed them by leading them on in negotiations before summarily rejecting the agreement on the very day that the project was declared in-service. The partners immediately exercised their contractual rights under the partners consent and agreement to decline to make further capital contributions to the partnership that otherwise would have been required under the standstill agreement and the loan guarantee agreement. The written notices to terminate participation, dated August 1, 1985, were based on the determination of the partnership's management committee that, after Secretary Herrington's action, there was no longer reasonable assurance that the project would generate sufficient cash to permit the partnership to make timely principal and interest payments on its outstanding debt and to make distributions over a 10-year period following the in-service date that were at least equal to the contributed equity. As

previously indicated, these were the contractual premises for termination of participation.

Although the partners terminated participation in the project, the partnership continued its legal existence. No partner withdrew from the partnership. The partnership's liabilities were unaffected. It was understood, however, that the partners' termination of participation would lead to an event of default by the partnership under the loan guarantee agreement, allowing DOE to assume control over the project.

## The Partnership Defaults on the FFB Loan

After the partners declined to contribute further equity to the partnership with respect to the DOE-guaranteed financing, the partnership was unable to make the deferred principal, interest, and guarantee fee payments due on August 1, 1985, under the standstill agreement. The partnership's failure to make these payments constituted an event of default under the loan guarantee agreement and the mortgage.

In August and September 1985, pursuant to the loan guarantee agreement, DOE made payments to FFB totaling approximately $1.57 billion. This sum represented the entire amount of principal and interest that the partnership owed FFB under the credit agreement and that correspondingly became due from DOE under the loan guarantee agreement. Upon paying these amounts due under the loan guarantee obligations, DOE became

subrogated to FFB's claims. By letter dated October 9, 1985, DOE made written demand upon the partnership for payment of all guaranteed indebtedness, together with accrued interest from September 30, 1985.

## DOE Takes Control of the Project

After the partnership's default, DOE assumed control of the Great Plains project. Legal title to the project and its assets, however, remained with the partnership. In public statements, DOE acknowledged that it was not the legal owner of the Great Plains project and that it would not acquire legal ownership of the facility until there was a foreclosure sale.

By letter dated August 1, 1985, DOE invoked its option to cause ANG, as project administrator, to continue operating the project in substantially the same manner as had been done for the partnership. DOE advised the pipeline affiliates that it was substituting the Secretary of Energy for the partnership as the seller in the gas purchase agreements.

By letter to DOE dated August 2, 1985, the partnership acknowledged receiving a copy of DOE's prior-day letter to ANG. The partnership advised DOE that, in order to permit the project administrator to carry out its duties as instructed by DOE, the partnership would exercise no responsibility or control over the project as of August 1, 1985. Also on August 2, 1985, the partnership advised vendors and suppliers working for the project

that control over the Great Plains project had reverted to DOE and that ANG was now acting solely at the direction and under the control of DOE.  The partnership advised the vendors and suppliers that DOE had halted all capital improvements at the project and was unwilling to fund such expenses; accordingly, the partnership instructed the vendors and suppliers to cease providing services, materials, or labor, or otherwise incurring expenses for capital projects until further notice from DOE.

On or about August 13, 1985, DOE stated publicly that it would allow the Great Plains project to continue operating temporarily while DOE and officials for the State of North Dakota discussed ways to meet DOE's conditions for long-term plant operation.  Shortly thereafter, ANG and the United States reached a revised project administration agreement.  Under this agreement, ANG was formally reappointed project administrator, with complete authority, subject to the DOE Secretary's directions, to do all things necessary for the operation and maintenance of the Great Plains gasification plant and related facilities.  Under this agreement, ANG was to be paid a performance fee of approximately $3 million per year.

Accordingly, ANG employees (numbering at least 800) continued to operate the project as they had before the partners terminated their participation.  Liaison between DOE and the project administrator was conducted through designated employees

of the project administrator and DOE's regional office in Chicago, Illinois. DOE was not, however, directly involved in the plant's day-to-day operations.

The Partnership's Continued Activity

After DOE assumed control of the project, there were continuing disputes between the partnership and DOE, including disputes over the partnership's and the partners' liability for project expenses incurred under the standstill agreement.[14] In September and October 1985, ANG and DOE requested the partnership's permission to sell certain "excess" project assets, including parcels of real property, portable living quarters, and some items of equipment. The partnership declined to approve the sale.[15]

Although the partnership did not direct or control the Great Plains project after DOE assumed of control of it on August 1,

---

[14] After several months of negotiations, the parties agreed that the partnership owed DOE $13.4 million. In July 1987, the management committee met to approve this agreement and to call for further equity contributions of $12.5 million from the partners to the partnership. The partnership also made an additional cash call to satisfy a settlement with the State of North Dakota for sales and use tax liabilities.

[15] In an Oct. 14, 1985, letter to the project administrator, C. W. Rackley, chairman of the partnership's management committee, advised that authority to approve the sale no longer rested with the Management Committee and suggested that the request be directed to DOE. In a Nov. 1, 1985, letter to DOE, Mr. Rackley indicated that in view of the pending foreclosure action, the partnership had been advised that it would not be appropriate for the management committee to approve the sale.

1985, representatives of the partners and the partnership continued to meet on matters concerning the partnership and the project. There were numerous meetings of the partnership's management, tax, and finance committees. ANG continued to maintain insurance on the project, paying the insurance premiums out of project revenues. The partnership continued to be named as the insured party on these insurance policies.

The Project's Improving Financial Situation

During August 1985, DOE advanced approximately $1,597,000 to cover project expenses. The advance was repaid to DOE in December 1985 out of project revenues. After August 1985, DOE provided no other funds for the project.

For the 6 months following August 1, 1985, cumulative revenues from the Great Plains project exceeded cumulative expenses. The project continued to operate with a positive cashflow in 1985, 1986, and 1987, accumulating a surplus of more than $130 million. For the 11 months ended June 30, 1986, the project generated positive cashflow of about $57 million. For the year ended June 30, 1987, the project generated positive cashflow of about $16 million. ANG continued to use project revenues to operate the gasification plant, with excess revenues' being segregated in separate accounts.

The Partners' Ongoing Efforts To Reopen Negotiations With DOE

On August 23, 1985, Transco Energy's CEO, Mr. Jack Bowen, met with DOE Deputy Secretary Boggs to discuss a possible workout of the partnership's debt. This meeting occurred even as the partners were embarking on a public relations campaign directed at North Dakota citizens, lobbyists, the White House, and members of Congress, to bring DOE back to the negotiating table.

As discussed in greater detail infra, on August 29, 1985, DOE initiated court proceedings to foreclose on the project assets. The next day, Transco Energy submitted to DOE a "discussion draft" outlining key elements for the partnership's continued participation in the project. This discussion draft contemplated that the partnership would retain title to the plant and proposed making interest on the DOE-guaranteed debt contingent on project cashflow. The discussion draft included no provision for additional capital contributions by the partners.

Between August and November 1985, Mr. Bowen had more meetings and telephone conversations with various high-level DOE officials regarding a possible workout. The other partners were kept informed of these discussions. Mr. Bowen offered to have all the partners meet directly with DOE, but DOE indicated a preference to work through only one contact until a proposal was sufficiently developed to require input from all the partners. DOE agreed to prepare a proposal for the partners' consideration.

Each partner was represented at a December 6, 1985, meeting between the partnership management committee and DOE representatives. At this meeting, the partners discussed restructuring the $1.57 billion outstanding debt into a contingent-interest debt, similar to what had been envisioned in the price support agreement that the partnership had reached with SFC in July 1985.[16]

In a December 19, 1985, telephone call with Transco Energy representatives, DOE General Counsel Mike Farrell indicated that the "discussion draft" Transco Energy had submitted on August 30, 1985, was a "non-offer". In particular, DOE was unwilling to allow the partners to retain title to the plant, retain all tax benefits from the project, and yet have the right to terminate participation. Advised that title to the plant and the resulting tax benefits were the partners' only source of cash in the event of a revenue shortfall, Mr. Farrell indicated that there was probably some "wiggle room" on the tax benefits issue.

On January 29, 1986, ANRC submitted to DOE an outline of a restructuring proposal.[17] The proposal would have allowed the

---

[16] Presumably, interest continued to accrue on the debt. The parties, however, have ignored interest accruals in referring to the $1.57 billion debt. For simplicity, we do the same.

[17] Under the proposal, the partnership would retain ownership of the plant and continue to be responsible for its operation, DOE would withdraw its foreclosure action, and the partnership's debt would be restructured into a contingent-interest obligation.

partnership to retain ownership of the plant and would have required, among other things, that the partnership recommence operating the project, covering cash shortfalls through further cash investments in the project up to an amount equivalent to the tax credits previously earned from the project. On January 30, 1986, representatives of Transco Energy and ANRC met with DOE Deputy Secretary Boggs and DOE General Counsel Farrell regarding the restructuring proposal. The DOE representatives stated that they found "nothing offensive" in the proposal and that DOE would consider it and respond.

The partners continued to meet and discuss these matters. The other partners were divided over whether to join ANRC's proposal to DOE. At an April 1, 1986, meeting, Transco and Pacific agreed to participate in ANRC's proposal, although Pacific indicated that it intended to "take a passive position for the present". Tenneco and Midcon declined to participate in ANRC's proposal on the ground that the tax benefits they had realized from the project were insufficient to justify the additional capital contributions contemplated under the proposal. Neither Tenneco nor Midcon sought, however, to obstruct the other partners' efforts to retain the partnership's future involvement in the project.

In the meantime, other events threatened to overtake the negotiations with DOE. In February 1986, DOE had asked the public for "expressions of interest" in acquiring or

participating financially in the project's operation.[18]  As discussed in greater detail infra, on April 7, 1986, a Federal District Court directed the mortgage on the partnership's $1.5 billion debt to be foreclosed; the court scheduled the foreclosure sale for May 18, 1986 (subsequently extended to June 30, 1986).

Partners Request Letter Ruling

On May 22, 1986, ANR and Transco filed with the IRS a request for a ruling that the partnership's default on the indebtedness and related events had not resulted in recapture of investment or energy credits or given rise to gain recognition. The partners viewed such a ruling as fundamental to pending proposals to use prior tax benefits to fund additional capital infusions into the project.  The partners did not want to be in the whipsaw position of having both to recapture the tax benefits and to use them to fund the project.  ANR and Transco requested the IRS to expedite consideration of the ruling request to enable them to submit their restructuring proposal to DOE and prevent the impending foreclosure sale of the project.  (As discussed in greater detail infra, in September 1986 the IRS ruled that the events as of May 22, 1986, had not resulted in recapture of investment or energy credits or given rise to gain recognition.)

---

[18] On Apr. 4, 1986, ANRC filed a statement of interest, which was one of nine received by DOE.

Final Debt-Restructuring Proposals

On May 28, 1986, ANRC and Transco Energy submitted to DOE a formal restructuring proposal.  This proposal contemplated restructuring the DOE debt and providing $210 million of capital infusions to fund continued project operations, contingent upon receipt of a favorable IRS ruling that no recapture of taxable credits or recognition of taxable gain had yet occurred. Although Pacific did not join this formal submission, it was aware of it and contemplated continuing participation in the project if a restructuring agreement could be reached and the IRS provided a favorable ruling.

By letter dated June 9, 1986, DOE rejected the May 28, 1986, proposal.  DOE insisted that any proposal must include a "substantial cash payment" to DOE toward partial retirement of the $1.57 billion debt, "such that the payment outweighs the tax benefits subject to recapture if the Project is acquired by an outside party".

An internal Transco memorandum dated June 20, 1986, from a lawyer in Transco's legal office, reported communications that day with Mr. S. Kinnie Smith, Jr., ANR's vice chairman and legal counsel, advising Mr. Smith that Transco did not see a "significant reason" to pursue an appeal of the foreclosure order and did not wish to "dilute" Transco's appeal on gas contract issues by "interjecting rather weak arguments relating to

foreclosure procedures".  The memo indicated that Mr. Smith had already spoken with Tenneco and Pacific "both of whom did not want to participate in an appeal, and therefore did not want to have the partnership itself file an appeal".

By this time, the foreclosure sale of the project assets, previously scheduled for June 30, 1986, was imminent.  In a June 24, 1986, meeting with DOE General Counsel Farrell, ANRC made a final proposal.  An introductory page of bullet points regarding the proposal bore the caption "THE PLANT UNDER PRESENT CIRCUMSTANCES IS WORTHLESS".  The proposal included an immediate $100 million payment to DOE, additional cash infusions of $40 million from current partners, and a $90 million letter of credit for project working capital.  The proposal also contemplated that a significant part of the project's cashflows would be applied to pay down the DOE debt.  The proposal identified ANRC, Transco Energy, and Pacific as the "participating partners".  In a letter dated June 25, 1986, DOE General Counsel Farrell summarily rejected this final proposal.

A June 26, 1986, Transco interoffice memorandum indicated that, on the basis of conversations with ANR personnel, ANR "does not plan to submit a revised proposal because in their view it would be futile - unless a favorable signal and change in direction comes from the DOE within the next two working days. P.S. - In short, it sounds like the gig is up".

As discussed at greater length below, on June 30, 1986, the foreclosure sale was held as scheduled, DOE purchased the project's mortgaged assets, and ANR filed an appeal of the foreclosure proceeding.

## The Foreclosure Proceedings

### DOE Initiates Foreclosure Proceedings

As previously noted, on August 29, 1985, DOE had initiated proceedings in the United States District Court for the District of North Dakota (the District Court) seeking foreclosure of the mortgage and sale of the mortgaged property.  The Government moved for summary judgment.  The partnership resisted, contending that the foreclosure should be conducted in accordance with North Dakota law, which it contended gave the partnership redemption rights for up to 1 year after the foreclosure sale.

### District Court Decision

On January 14, 1986, the District Court granted the Government's motion for summary judgment, holding that Federal law applied and gave the partnership no redemption rights.  In its memorandum and order, however, the District Court observed that there was no precedent involving this particular loan guarantee program, that a determination under the balancing test of United States v. Kimbell Foods, Inc., 440 U.S. 715 (1979), was a "close question", and that of the various options presented to the Court by the parties, "All have merit".

On April 7, 1986, the District Court entered an Order and Decree of Foreclosure and Sale that:  (1) Directed the mortgage be foreclosed and the mortgaged assets sold by public auction on May 28, 1986; and (2) held that the partnership and the partners were not entitled to redemption rights.

On April 18, 1986, the partnership filed a motion to amend the District Court's April 7, 1986, Order and Decree so as to: (1) Clarify that recovery was limited to the partnership's assets and the interests of the partners therein; (2) correct the property descriptions; and (3) defer the foreclosure sale for at least 6 months to enable pending workout negotiations to continue between certain partners and DOE.  With regard to this latter point, the motion stated that the partnership had claimed and passed through to its partners investment tax credits of approximately $250 million and deductions of approximately $390 million and that a substantial part of these credits and deductions would be subject to recapture if the plant were disposed of in less than 5 years.  The motion indicated that pending proposals by some of the partners to continue operating the plant and to restructure the DOE-guaranteed indebtedness depended upon the continued availability of the economic value of these tax benefits.  The partnership requested a period for "equitable redemption" and contended that the foreclosure sale should be deferred pending the partners' ongoing efforts to

restructure the debt.  The State of North Dakota intervened, urging delay of the foreclosure sale and citing adverse economic impacts from closing the plant.

By order dated May 8, 1986, the District Court denied the partnership's motion for a period of equitable redemption, concluding that it lacked authority to grant such relief where the order of foreclosure had already been entered.  The District Court also noted that the partnership and the partners "talk of 'redemption', but it is apparent that 're-negotiation' would be a more accurate description".  Nevertheless, the District Court postponed the foreclosure sale date from May 28 to June 30, 1986, to permit the notice of sale to be republished with corrected property descriptions.

The June 30, 1986, Foreclosure Sale

On June 30, 1986, the foreclosure sale was held.  The lone bidder was DOE, which bid $1 billion for the partnership's mortgaged assets.[19]  The U.S. Marshal filed with the District Court a Marshal's Return and Report of Sale and a Certificate

---

[19] As discussed in more detail infra, certain assets necessary for operating the project were not among the partnership's mortgaged assets but were instead owned by ANG (the subsidiary of ANRC, which also owned ANR, a general partner in the partnership).  As a precondition for the loan guarantee agreement, DOE had required ANRC to pledge as security all its ANG stock.  Petitioner asserts, and respondent does not dispute, that DOE purposefully bid less than the full amount of the $1.57 billion debt, intending subsequently to use the balance of the debt to obtain the ANG stock.

of Sale stating that DOE had purchased the mortgaged assets of the project for $1 billion at the public foreclosure sale.[20]

### Objections to the Foreclosure Sale

On July 7, 1986, ANR filed with the District Court objections to the foreclosure sale. The premise of the objections was that the sale had been improperly conducted without providing the partnership redemption rights under applicable North Dakota foreclosure statutes or equitable rights of redemption under Federal common law. On July 14, 1986, the District Court overruled ANR's objections and confirmed the foreclosure sale. The court noted that "the legal entity foreclosed upon, the partnership, has not objected to the sale" and questioned whether ANR had standing to object.

On July 16, 1986, the Marshal issued the Marshal's Deed to DOE, and the deed was recorded in the local property records.

### Appeal of the Foreclosure Proceedings

On June 30, 1986, ANR, as a general partner of the partnership, filed a notice of appeal in the foreclosure

---

[20] The $1 billion was applied to pay principal of about $891 million and accrued interest of about $109 million. Although the record is silent on this point, it seems unlikely that any funds actually changed hands in this transaction. Pursuant to the indenture of mortgage, DOE was authorized to bid for and purchase the mortgaged assets, and the trustee was directed to apply the proceeds to repay DOE the amounts DOE had previously paid FFB pursuant to the guarantee agreement. The net result of these transactions would have been simply to reduce the partnership's obligation to DOE by $1 billion.

litigation to the U.S. Court of Appeals for the Eighth Circuit. The notice of appeal, which was served on all the partners, identified the appellants as the five individual named partners of the partnership and the partnership itself. The four partners other than ANR did not actively participate in the appeal, but they also did not actively oppose it, provided that ANR bore the associated legal expenses. ANR viewed a successful appeal of the foreclosure order as a way to force DOE back to the negotiating table. In addition, if the appeal had been successful, it would have benefited all the partners inasmuch as North Dakota law, if applicable, would have given the partnership rights to redeem the plant for 1 year after the foreclosure sale, while possessing and operating the plant during that 1-year period and retaining the cashflows generated.

On October 17, 1986, the United States filed its brief in the U.S. Court of Appeals for the Eighth Circuit, contending that the District Court properly ruled that North Dakota law should not apply. In its brief, the Government did not challenge ANR's authority or standing to file the appeal. The Government's brief asserted, however, that the real motive for ANR's filing the appeal was to postpone the foreclosure sale so as to "save the Great Plains partners as much as $347 million in tax recapture liability".

On March 11, 1987, the Eighth Circuit issued its opinion in United States v. Great Plains Gasification Associates, 813 F.2d 193 (8th Cir. 1987). The Court of Appeals affirmed the judgment of the District Court, though on different grounds, holding that the North Dakota redemption statute did not apply to the foreclosure of a loan, such as the FFB loan, that was guaranteed pursuant to the Federal Nonnuclear Research and Development Act of 1974.[21] In so doing, however, the Court of Appeals confirmed the nature of the redemption rights that North Dakota law would otherwise afford, stating:

> Were we to reverse the district court and look to North Dakota law for our rule of decision Great Plains would have the right to redeem at any time up to one year after judicial sale. N.D. Cent. Code § 32-19-18 (1976). During this period Great Plains would be entitled to the possession, rents, use, and benefit of the plant. N.D. Cent. Code § 28-24-11 (1974). * * * [United States v. Great Plains Gasification Associates, supra at 195.]

The Court of Appeals did not question ANR's standing to pursue the litigation as a partner of the partnership.

### Petition for Writ of Certiorari

On July 15, 1987, ANR, as a general partner of Great Plains Gasification Associates, filed a timely petition for a writ of certiorari with the U.S. Supreme Court, seeking review of the judgment of the Eighth Circuit. The petition, filed by a legal

---

[21] The Court of Appeals for the Eighth Circuit held further that the District Court did not err in refusing to grant the partnership an equitable right of redemption.

team headed up by former Solicitor General Rex E. Lee, contended that there was a recurring conflict among the circuits as to whether Federal or State law should apply to proceedings under federally guaranteed private loans such as the partnership's FFB loan.  In its brief in opposition to the petition for writ of certiorari, the United States did not suggest that ANR lacked authority or standing to pursue that litigation.  On November 2, 1987, the Supreme Court denied the petition for writ of certiorari, and the foreclosure litigation came to an end.

### The Partnership's Ratification of ANR's Appeal

The partners had monitored the appeal and petition for writ of certiorari.  On September 3, 1987, the partnership's management committee had adopted resolutions that expressly ratified ANR's actions relating to the foreclosure litigation.  By its terms, the ratification was effective retroactive to the date these actions were taken by ANR, as if ANR "had obtained the prior authorization of the Management Committee".  The resolutions also authorized the partnership's legal committee to determine the manner in which the litigation would be conducted on the partnership's behalf in the event the Supreme Court granted the petition for writ of certiorari.

### Discharge of Remaining Debt

As previously noted, ANRC owned the outstanding stock of ANG, which was the project administrator.  ANRC had pledged this

stock as additional security for the partnership's obligation to DOE under the loan guarantee agreement. ANG held deeds, easements, and contract rights (the ANG project assets) that were needed to operate the project but that had not been titled in the partnership's name. Consequently, DOE had not acquired the ANG project assets in the foreclosure sale that was conducted on June 30, 1986. At the foreclosure sale, the Government had applied only $1 billion of the approximately $1.57 billion debt to acquire the partnership's assets that were subject to the mortgage. The Government had intentionally kept the remaining balance of the indebtedness in reserve for subsequent use in acquiring the ANG stock.

In November 1987, DOE considered foreclosing on the ANG stock. In a settlement agreement entered into on October 13, 1988, ANRC assigned its ANG stock to DOE, which then released the partnership's outstanding indebtedness. In the settlement agreement, ANRC acknowledged that the fair market value of the ANG stock and all remaining collateral securing the partnership's obligations under the guarantee agreement was less than the partnership's outstanding indebtedness to DOE. The settlement agreement recites that ANRC was entering into the settlement agreement partly "to avoid the expense of litigation to foreclose" DOE's lien on the ANG stock pursuant to the pledge agreement.

DOE Sells the Project Assets

Once the Supreme Court denied ANR's petition for writ of certiorari in the foreclosure litigation, DOE began making plans to sell the project assets. In a press release dated December 9, 1987, DOE identified 15 potential buyers of the project. One of these potential buyers was the Coastal Corp. (Coastal), which had acquired ANRC in March 1985. Ultimately, however, DOE selected Basin Electric, a North Dakota cooperative, as the successful bidder. On October 31, 1988, the United States sold the project assets to two subsidiaries of Basin Electric--Dakota Gasification Co. and Dakota Coal Co.

The Partnership Continues To Operate

Throughout 1988 and 1989, the partnership's management, legal, finance, and tax committees continued to meet and report to the partners on open issues, including tax issues related to the project. The partnership's tax committee concluded that the partnership ceased to own the project for tax purposes on November 2, 1987, the date that the Supreme Court denied the petition for writ of certiorari in the foreclosure proceedings.

Respondent's September 1986 Letter Ruling

As previously noted, on May 22, 1986, while negotiations about a possible debt workout were ongoing with DOE, ANR, and Transco had filed with the IRS a request for a private ruling regarding potential tax consequences from the partnership's

default on the project indebtedness. On September 10, 1986, the
IRS issued Private Letter Ruling 8649051 (the September 1986
letter ruling). In this 28-page ruling, the IRS concluded that,
as of May 22, 1986 (the date of the ruling request), the
partnership had not abandoned the project or made other
disposition of the project. The ruling stated:

> There are two facts involved here that negate the
> argument that * * * [the partnership] has abandoned the
> Project. First, * * * [ANR] and * * * [Transco] are
> continuing to seek a solution to the financial
> difficulties facing the Project by negotiating an
> agreement with * * * [DOE] that would permit * * * [the
> partnership's] continued participation in the Project.
> Second, by refusing to grant approval for * * * [DOE]
> to sell excess assets of the Project, * * * [the
> partnership] has shown that it has not abandoned all
> rights or involvement in the Project or control over
> the Project's assets.

Approximately 10 years after the IRS National Office issued
this letter ruling, the Houston IRS District Office submitted to
the IRS National Office factual and legal objections to the
ruling, contending that the partners' original ruling request had
omitted or misstated material facts that resulted in an incorrect
ruling. On October 17, 1997, the IRS National Office issued
Technical Advice Memorandum 9811002, which rejected the
objections of the IRS Houston District Office, stating:

> although the ruling request omitted certain information
> that bore some relevance to the underlying tax issues
> and characterized other information differently than
> the District, these additional facts and alternate
> characterizations, when taken together, were not
> material. Therefore, the * * * [ruling] is to be
> applied by the district director in the determination

of the tax liability of * * * [Transco] and * * *
[ANR].

Partnership's Return Position and Respondent's Determinations

On its 1987 Form 1065, U.S. Partnership Return of Income,
the partnership reported that the "partial foreclosure sale" of
the coal gasification plant became final on November 2, 1987, the
date the Supreme Court denied the petition for a writ of
certiorari.  On its 1987 return, the partnership reflected
income, deductions, losses, and tax credits from the project on
the basis that its ownership of the plant ended November 2, 1987,
reported gains and losses resulting from the "partial foreclosure
sale", and reported basis of foreclosed assets to enable the
partners to determine recapture of tax credits.  The partnership
reported $1 billion as the proceeds from the "partial foreclosure
sale".  In a disclosure statement, the partnership stated that it
was treating the $1 billion foreclosure sale price as "the amount
of the taxpayer's nonrecourse indebtedness that was discharged as
a result of the disposition of certain assets by the foreclosure
sale".  The partnership asserted that DOE was continuing to
assert a claim against the partnership for approximately $681
million.[22]

By four separate notices of final partnership administrative
adjustments (FPAA) issued May 24, 2001, respondent took

---

[22] We infer that this amount included interest on the debt.

alternative, whipsaw positions, determining that the partnership had engaged in a sale or exchange of the plant as of various dates in 1985, 1986, 1987, and 1988, requiring recapture of tax credits, recognition of gain resulting from the discharge of the indebtedness, and other tax consequences as of these various alternative dates. In the FPAA for the partnership's 1985 tax year, respondent asserted that the partnership engaged in a sale or exchange of the project and related assets on or before August 1, 1985. In the FPAA for the partnership's 1986 tax year, respondent asserted that the partnership engaged in a sale or exchange of the plant and related assets on June 30, 1986, or in the alternative, on July 14, 1986. In the FPAA for the partnership's 1987 tax year, respondent asserted that the partnership engaged in a sale or exchange of the plant and related assets on January 1, 1987, or in the alternative, on November 2, 1987. In the FPAA for the partnership's 1988 tax year, respondent asserted that the partnership engaged in a sale or exchange of the project and related assets on January 1, 1988. In each of these FPAAs, respondent asserted identically: "The full amount of the outstanding nonrecourse mortgage, including all accrued interest, is included in the amount realized on disposition of the plant."

OPINION

I.   Date of the Partnership's Disposition of Project Assets

We must decide the date as of which the partnership should be treated for Federal tax purposes as having disposed of its interest in the Great Plains project.  The parties have stipulated, consistent with respondent's September 1986 letter ruling, that "no sale, exchange or other disposition of the Great Plains gasification plant or any assets related thereto by Great Plains Gasification Associates occurred on or before May 22, 1986".

On brief, respondent argues that the partnership disposed of the project assets on June 30, 1986, the date of the foreclosure sale.[23]  Respondent argues primarily that the foreclosure sale itself constituted the disposition.  Alternatively, respondent argues that the partnership abandoned its interests in the project on or by June 30, 1986.

Petitioner contends there was no disposition or abandonment of the project assets until the foreclosure litigation terminated on November 2, 1987.

_____

[23] In one sentence, respondent's opening brief posits alternatively that the disposition occurred on July 14, 1986, "the date the sale was confirmed by the District Court".  Apart from this fleeting reference, however, respondent's brief makes no separate argument for July 14, 1986, as the disposition date.

A.   Did the June 30, 1986, Foreclosure Sale Constitute Disposition by the Partnership?

A "transfer upon the foreclosure of a security interest" constitutes a disposition of mortgaged property so as to trigger recapture of a portion of investment tax credits and business energy credits previously claimed with respect to the property.[24] Sec. 1.47-2(a)(1), Income Tax Regs.  Similarly, a foreclosure sale constitutes a disposition of property pursuant to section 1001(a).[25]  See Helvering v. Hammel, 311 U.S. 504 (1941); Aizawa v. Commissioner, 99 T.C. 197, 198 (1992), affd. 29 F.3d 630 (9th Cir. 1994); Ryan v. Commissioner, T.C. Memo. 1988-12, affd. sub nom. Lamm v. Commissioner, 873 F.2d 194 (8th Cir. 1989).

If local law provides the mortgagor a right to redeem the property, the foreclosure sale generally is not final for tax purposes until the right of redemption expires.  Derby Realty Corp. v. Commissioner, 35 B.T.A. 335, 338 (1937); Hawkins v. Commissioner, 34 B.T.A. 918, 922-923 (1936), affd. 91 F.2d 354

---

[24] In general, a taxpayer must recapture a portion of previously allowed investment tax credits or business energy credits if the underlying property is disposed of before the close of the useful life taken into account in computing the credits.  See Jacobson v. Commissioner, 96 T.C. 577, 593 (1991), affd. 963 F.2d 218 (8th Cir. 1992).

[25] Tax consequences may vary depending upon whether the debt is recourse or nonrecourse, particularly in determining whether any amount realized from the foreclosure sale represents income from discharge of indebtedness.  See Aizawa v. Commissioner, 99 T.C. 197, 200-201 (1992), affd. 29 F.3d 630 (9th Cir. 1994).

(5th Cir. 1937).  As this Court explained in <u>Ryan v.</u>

<u>Commissioner</u>, <u>supra</u>:

> This is because the foreclosure action is the amalgam
> of two separate events.  First, there is an
> extinguishment of the underlying indebtedness, giving
> rise to income.  Cf. secs. 108, 61(a)(12), I.R.C. 1954.
> Second, there is a disposition of the property securing
> the debt, a sale or exchange.  The all events test
> requires both of these events to occur before income is
> realized.

> \*     \*     \*     \*     \*     \*     \*

> A foreclosure action that is being appealed is not
> 'final' in the normal sense of that word.

Pending foreclosure litigation has "the same effect as would

the fact that there was a period in which the right of redemption

under a foreclosure sale could be exercised."  <u>Morton v.</u>

<u>Commissioner</u>, 104 F.2d 534, 536 (4th Cir. 1939), revg. 38 B.T.A.

534 (1938).  The year in which litigation terminates is the year

in which the claimed item is to be taken into account for Federal

tax purposes.  See <u>Found. Co. v. Commissioner</u>, 14 T.C. 1333, 1354

(1950).

Citing <u>Morton v. Commissioner</u>, <u>supra</u>, and Rev. Rul. 70-63,

1970-1 C.B. 36, respondent acknowledges on brief:  "a <u>bona</u> <u>fide</u>

contest as to the existence of redemption rights may postpone a

disposition, even if such rights are ultimately held not to

exist."  Respondent contends, however, that the foreclosure

litigation was not bona fide.  Respondent contends that "the

redemption rights were worthless and would not have been

exercised even if the courts had awarded them" because financial

considerations made it improbable that the partnership would have redeemed the property.

Respondent focuses too narrowly, we believe, on the question of whether the partnership would have exercised the redemption rights, had they been awarded, to repurchase the project assets from DOE outright.  Such an inquiry would improperly lead us "into endless speculation on petitioner's financial situation and financial hopes".  Derby Realty Corp. v. Commissioner, supra at 341 (rejecting any "supposed principle of probability of redemption"); cf. Abelson v. Commissioner, 44 B.T.A. 98 (1941) (concluding that redemption rights were wholly without value and abandoned by the taxpayer who took no further action after the foreclosure sale to pursue redemption rights).  Moreover, respondent fails to appreciate that the public policy served by redemption rights is not merely in providing the mortgagor an opportunity to repurchase property sold in foreclosure but also in "'allowing time for the mortgagor to refinance and save his property, [and] permitting additional use of the property by the hard-pressed mortgagor'".  Nelson & Whitman, "Reforming Foreclosure:  The Uniform Nonjudicial Foreclosure Act", 53 Duke L.J. 1399, 1404 (2004) (quoting Hart, "The Statutory Right of Redemption in California", 52 Cal. L. Rev. 846, 848 (1964)).  North Dakota law reflected this broader purpose of redemption rights, as the Court of Appeals for the Eighth Circuit expressly

acknowledged in ruling upon the partnership's suit for rights of redemption:

> Were we to reverse the district court and look to North Dakota law for our rule of decision Great Plains would have the right to redeem at any time up to one year after judicial sale. N.D. Cent. Code § 32-19-18 (1976). During this period Great Plains would be entitled to the possession, rents, use, and benefit of the plant. N.D. Cent. Code § 28-24-11 (1974). * * * [United States v. Great Plains Gasification Associates, 813 F.2d at 195.]

Clearly, the 1-year redemption period, with attendant rights to possess the plant and receive its profits, would have had substantial value to the partnership. The project had generated significant cashflow both before and after the foreclosure sale.[26] According to credible testimony, the partners intended to use the 1-year redemption period to pursue further negotiations with DOE to restructure the debt; the cashflow generated during the 1-year redemption period would have allowed the partnership to sweeten the pot in negotiating with DOE.

Respondent speculates that, in the light of DOE's unreceptiveness to the debt restructuring proposals put forward immediately before the foreclosure sale, DOE would have also been unreceptive to any further efforts to restructure the debt during any redemption period. There is simply no way of knowing, however, how DOE might have responded if the partnership had been

---

[26] For the 11 months prior to the foreclosure sale, the project had generated positive cashflow of about $57 million. During the year after the foreclosure sale, the project generated positive cashflow of about $16 million.

awarded the redemption rights, especially in the light of DOE's long track record of mixed signals and reversals over the history of the Great Plains project.  But even if we were to assume, for sake of argument, that respondent's speculations are sound, the fact remains that the partnership would have benefited materially from the cashflows generated by the project during the redemption period.

In support of his position that the litigation over the disputed redemption rights should not postpone the finality of the foreclosure sale, respondent relies on L&C Springs Associates v. Commissioner, T.C. Memo. 1997-469, affd. 188 F.3d 866 (7th Cir. 1999).  Respondent's reliance on that case is misplaced. L&C Springs Associates held that a realization event with respect to mortgaged real estate occurred in the year before the foreclosure sale, when the taxpayer effectively abandoned the mortgaged property.[27]  L&C Springs Associates, unlike the instant case, did not involve the effect of ongoing foreclosure litigation on the finality of the foreclosure sale.

Respondent does not appear to dispute that the foreclosure litigation presented genuine legal issues as to whether the partnership retained redemption rights under North Dakota law.[28]

_____

[27] As discussed infra, we conclude that the partnership did not abandon the project prior to the conclusion of the foreclosure litigation.

[28] Similarly, respondent does not expressly advance any
(continued...)

Respondent contends, however, that "this is largely beside the point". Respondent states on brief: "The question is not whether the legal issues were bona fide, but whether the litigation was brought by Petitioner to achieve the stated purpose." Respondent contends that ANR, and not the partnership or Transco, undertook the foreclosure litigation "as a desperate attempt to delay the adverse tax consequences, not to redeem the property". Respondent cites Lutz v. Commissioner, 396 F.2d 412 (9th Cir. 1968), revg. 45 T.C. 615 (1966) for the proposition that litigation postpones tax consequences of a disposition only when the taxpayer is the party actually litigating the dispute. Respondent's bottom line seems to be that even if the foreclosure

_____

[28](...continued)
argument that the possibility of the foreclosure litigation's succeeding was too speculative to justify deferring tax consequences of the foreclosure sale. Cf. Boehm v. Commissioner, 146 F.2d 553 (2d Cir. 1945) (loss for worthless stock was not deferred pending outcome of shareholders' derivative action of unproven value), affd. 326 U.S. 287 (1945); Found. Co. v. Commissioner, 14 T.C. 1333, 1354 (1950) (loss on construction contract with a foreign Government was properly deferred until conclusion of litigation over breach of contract, where the taxpayer held a "reasonable view" that it could prevail on its claim). We note, however, that in the foreclosure proceeding, wherein the partnership contended that the foreclosure should be conducted in accordance with North Dakota law allowing for a 1-year redemption period, the District Court characterized the partnership's position as having "merit" even though it ultimately resolved this "close question" against the partnership. Indeed, in May 1985, DOE Assistant Secretary Mares had testified before Congress that the partnership would be entitled under North Dakota law to a 1-year redemption period, during which it would be entitled to possession of the property and to its rents and profits. Mr. Mares testified that any waiver of those rights by the partnership would be void and unenforceable under North Dakota law.

litigation presented bona fide legal issues, the litigation itself was not bona fide. We are not persuaded by respondent's arguments.

ANR filed the appeal of foreclosure order in its capacity as a general partner of the partnership. In that capacity, pursuant to applicable provisions of North Dakota partnership law, ANR had actual and apparent authority to bind the partnership with respect to the appeal. See N.D. Cent. Code sec. 45-06-01 (1976). The other partners were aware of the litigation and were willing to let ANR take the lead in the litigation and to pay for it. The other partners gave at least tacit approval to ANR's pursuing the appeal which, if successful, would have protected the rights of the partnership and the other partners. Indeed, on September 3, 1987, the partnership's management committee formally ratified ANR's actions in this regard. Respondent seems to suggest that this formal ratification was invalid or ineffective but has advanced no convincing evidentiary or legal basis for this theory.[29]

---

[29] Respondent suggests that the ratifying resolutions were invalid, because they did not conform to various procedural steps required by the partnership agreement and because the copy of the ratification resolution in the record is unsigned. Other contemporaneous evidence indicates, however, that the ratification resolutions were in fact adopted by the management committee. For instance, in a letter to the law firm of Fulbright & Jaworski, dated Sept. 14, 1987, C.W. Rackley, chairman of the partnership's management committee, stated that he had been "duly authorized" to make various representations regarding the foreclosure litigation. Attached to the letter was
(continued...)

Respondent notes that ANR and the partnership had a tax incentive to delay final disposition of the project assets and contends that ANR's pursuit of the appeal and the partnership's ratification of ANR's actions were simply "window dressing". Respondent seems to suggest that the foreclosure litigation lacked economic substance. We disagree. Viewed in its totality, the record convinces us that petitioner and the partnership had legitimate and substantial business reasons, apart from tax considerations, to appeal the foreclosure litigation as part of their sustained effort to restructure the debt and salvage their half-billion dollar investments in the project. Cf. N. Ind. Pub. Serv. Co. v. Commissioner, 115 F.3d 506, 512 (7th Cir. 1997) (business actions "are recognizable for tax purposes, despite any tax-avoidance motive, so long as the corporation engages in bona fide economically-based business transactions"), affg. 105 T.C. 341 (1995).

In sum, we conclude and hold that the transfer of the project assets pursuant to the foreclosure sale was not finalized until November 2, 1987, when the Supreme Court denied the petition for writ of certiorari in the foreclosure litigation.[30]

---

[29](...continued)
a copy of the ratification resolutions, which Mr. Rackley's letter stated "were duly adopted by the Management Committee of the Partnership on September 3, 1987".

[30] For similar reasons, we reject respondent's claim, raised in cursory fashion on brief, that as of June 30, 1986, the
(continued...)

B.  Whether the Partnership Abandoned the Property

On brief, respondent argues alternatively that even if the June 30, 1986, foreclosure sale did not constitute a final disposition of the partnership's project assets, the partnership had abandoned the project as of June 30, 1986, or alternatively, as of July 14, 1986 (the date the District Court overruled ANR's objections and confirmed the foreclosure sale).[31]  Respondent has conceded, consistent with the holding of his September 1986 letter ruling, that no abandonment had occurred as of May 22, 1986.  As we understand respondent's somewhat mercurial position in this proceeding, events occurring between May 22 and June 30, 1986, or possibly between May 22 and July 14, 1986, or possibly

---

[30](...continued)
project assets were owned by the United States and consequently, pursuant to secs. 1.47-2(a)(2) and 1.48-1(k), Income Tax Regs., the project assets ceased to qualify as sec. 38 property as of June 30, 1986.  It is not the foreclosure sale itself but the "transfer upon the foreclosure" that represents the final disposition of assets that would trigger tax credit recapture. Sec. 1.47-2(a)(1), Income Tax Regs.  As respondent has conceded, a bona fide contest as to the existence of redemption rights postpones a disposition pursuant to a foreclosure sale.

[31] On opening brief (but not on reply brief), respondent contends broadly that both the partnership and Transco had abandoned their interests in the project as of June 30, 1986. Inconsistently, respondent's response to petitioner's motion in limine, filed Jan. 31, 2005, states: "Respondent no longer contends that the Court should consider the issue of whether the partners abandoned their partnership interests in GPGA."  We deem respondent to have waived any claim that Transco abandoned its partnership interest or its interests in the project (which arose only by virtue of Transco's partnership interest).  Consequently, we need not address whether such a partner-level inquiry is appropriate in this TEFRA proceeding.

on June 30, 1986, or possibly on July 14, 1986, constituted an abandonment by the partnership of the project assets.[32]  We disagree.

The existence or timing of an abandonment is "inherently a factual matter that requires a practical examination of all the circumstances".  L&C Springs Associates v. Commissioner, supra at 870.  The courts have applied different standards for analyzing the timing of abandonment losses and the timing of abandonment gains.  Generally, a determination of an abandonment loss requires an intention on the owner's part to abandon the asset, along with an "affirmative act" of abandonment.  A.J. Indus., Inc. v. United States, 503 F.2d 660, 670 (9th Cir. 1974); see L&C Springs Associates v. Commissioner, supra; Middleton v. Commissioner, 77 T.C. 310, 322, affd. per curiam 693 F.2d 124 (11th Cir. 1982).  On the other hand, where, as in the instant case, abandonment of an asset would result in income recognition

---

[32] As previously noted, although respondent occasionally posits July 14, 1986, as an alternative date of abandonment, respondent's arguments do not otherwise direct our attention to any circumstances or analysis supporting that date.  Respondent has been inconstant in his position as to whether he believes the partnership abandoned the project before June 30, 1986, or on that date.  In a Jan. 5, 2005, hearing on petitioner's motion for summary judgment, respondent's counsel advised the Court that respondent's position "is that there was no abandonment or other disposition of the property until June 30" (emphasis added).  Inconsistently, on brief respondent contends that the partnership abandoned the project "by June 30, 1986" (emphasis added).  Respondent's arguments on brief, focusing largely on pre-June 30, 1986, events, suggest that this evolution of respondent's choice of prepositions is purposeful.

or recapture of tax credits or deductions, an overt act of abandonment is unnecessary if, under the facts and circumstances, "it is clear for all practical purposes that the taxpayer will not retain the property".  L&C Springs Associates v. Commissioner, supra at 870; see Cozzi v. Commissioner, 88 T.C. 435, 445-446 (1987); Brountas v. Commissioner, 74 T.C. 1062, 1074 (1980).

Consistent with his September 1986 letter ruling, respondent has stipulated that the partnership did not dispose of the project before May 22, 1986 (the date of the letter ruling request).  Notwithstanding this stipulation, however, respondent suggests that even before May 22, 1986, the partnership was in the process of "gradually" abandoning the project.  In support of his position, respondent points to many of the same circumstances that were considered in the September 1986 letter ruling. Respondent notes, among other things, that on August 1, 1985, the partners and partnership gave DOE written notice that they were terminating their participation in the project; that various partners, with varying degrees of interest and of active participation of other partners, attempted unsuccessfully for many months to negotiate with DOE to restructure the debt; and that, in respondent's view, certain of the partners had effectively abandoned the project.  As the September 1986 letter ruling concluded, however, and as respondent now concedes, these

pre-May 22, 1986, circumstances did not amount to an abandonment of the project by the partnership.

The gist of respondent's argument, as we understand it, is that events occurring after May 22, 1986, and no later than July 14, 1986, tipped the balance, transforming what respondent views as the partnership's gradual abandonment-in-process into actual abandonment, somewhat as ever-colder water will finally make ice. The post-May 22, 1986, events that respondent points to in support of this theory are essentially these:  On May 28, 1986, ANRC and Transco Energy submitted to DOE a new proposal, which DOE rejected on June 9, 1986; on June 20, Transco informed ANR that it would not participate in appealing the District Court's foreclosure order; on June 24, 1986, ANRC and Transco Energy submitted to DOE yet another proposal, which DOE rejected on June 25, 1986; and the foreclosure sale occurred on June 30, 1986, without any bids from the partnership or any partner.

We are unpersuaded that there was such a change in the partnership's business climate immediately after May 22, 1986, as to say that the partnership should be deemed to have abandoned the project assets on (or by) July 1 or 14, 1986, if, as respondent concedes, the partnership had not abandoned them before then.  Rather, it appears to us that the post-May 22, 1986, events were mainly a continuation of the partners' ongoing, albeit ultimately unsuccessful, efforts to protect their significant investments in the project.

Respondent suggests that the May 1986 proposal and June 1986 proposal lacked genuine substance because they omitted certain elements previously demanded by DOE and were motivated purely by tax considerations.[33] We disagree. Extensive, uncontradicted testimony convinces us that these were reasonable business proposals put forward by the partnership's principals in good-faith negotiations with DOE.

Ultimately, the project assets were taken from the partnership involuntarily through the foreclosure process. Even then, the partnership did not abandon the assets. To the contrary, as previously discussed, ANR, with at least the tacit approval of the partnership's other partners and ultimately with

---

[33] In support of his claim that there was no substantive nontax purpose for these proposals, respondent cites several internal memoranda written and exchanged by the partners. Among those internal memoranda is a Tenneco interoffice communication dated August 26, 1987 (Exhibit 314-R), which states in part:

> The * * * [4 partners other than ANR] previously refused to actively participate in the appeal because of the desire to minimize legal exposure on other matters and the lack of optimism associated with the litigation. Transco and Pacific * * * have changed their position and would vote to ratify * * * [ANR's] efforts. Midcon is still opposed. A change in our position would allow the opinion process to go forward.

At trial, petitioner raised evidentiary objections to this document based on authenticity and completeness. The Court overruled the objection as to completeness but reserved ruling on the authenticity objection, inviting the parties to address the issue on brief. Petitioner has not addressed this issue on brief. Consequently, we deem petitioner to have waived authenticity objections to this document, and we shall receive Exhibit 314-R into evidence.

their formal approval, pursued bona fide litigation over the foreclosure order.

This case bears some similarity to <u>Energy Res. Ltd. Pship. v. Commissioner</u>, T.C. Memo. 1992-386.  In that case, a partnership constructed an oil cleansing refinery, using revenue bonds guaranteed by the U.S. Small Business Administration (SBA) and secured by a mortgage on the facility.  In 1983, shortly after the facility became operational, financial and technical difficulties forced the partnership to shut the facility down.  The partnership went into bankruptcy.  Eventually, SBA assumed maintenance and security responsibility for the plant.  Nevertheless, the partnership, through its principals, continued efforts to raise additional funds for the project, proposed various types of arrangements to potential purchasers, resisted efforts by SBA to foreclose on the property, and engaged in negotiations with SBA and the bankruptcy court.  In 1984, the bankruptcy court granted SBA's motion to sell the plant to a third party.  In holding that the partnership had not abandoned the plant when it was shut down in 1983, this Court observed that the level of activity displayed by the partnership's principals showed that they considered the project to be of continuing utility and was "sufficiently extensive, repeated, continuous, or substantial" to negate a conclusion that they had abandoned the project.

Similarly, in the instant case, the efforts of the partnership's principals to restructure the debt and to appeal the foreclosure order convince us that they considered the project to be of continuing utility and had not abandoned it as of June 30 or July 14, 1986.

Consequently, we hold that for Federal tax purposes the there was no sale, exchange, abandonment, or other disposition of the project assets until November 2, 1987, when the foreclosure litigation ended.

II.  When Was the Partnership's Indebtedness Discharged?

In August 1985, the partnership defaulted on its $1.57 billion debt to FFB under the credit agreement.  Shortly thereafter, pursuant to the loan guarantee agreement, DOE paid off the debt.  The partnership's obligation to FFB then shifted to DOE, not as a new debt, but by subrogation, with DOE stepping into FFB's shoes as creditor.  See Putnam v. Commissioner, 352 U.S. 82, 85 (1956); Lair v. Commissioner, 95 T.C. 484, 490 (1990).

In July 1986, pursuant to the indenture of mortgage, the partnership's assets were "sold" to DOE at foreclosure for $1 billion; this amount was applied against the partnership's debt to DOE.  Petitioner asserts, and respondent does not dispute, that DOE purposefully bid less than the full amount of the partnership's $1.57 billion debt so as to have available the remaining debt to acquire the ANG stock, which ANRC had pledged

as additional security for the partnership's debt to DOE.  In
October 1988, pursuant to a settlement agreement between ANRC and
DOE, ANRC assigned its ANG stock to DOE, which then released the
remaining $570 million indebtedness.

The parties disagree as to when this $570 million debt
balance should be treated as having been discharged.  Petitioner
asserts that only $1 billion of the debt was discharged by the
foreclosure sale and that the remaining $570 million of the debt
was not discharged until October 1988, when ANRC assigned its ANG
stock to DOE pursuant to the settlement agreement.  Respondent
contends that because the debt was nonrecourse, pursuant to
Commissioner v. Tufts, 461 U.S. 300 (1983), the partnership must
take into account the entire amount of the $1.57 billion
indebtedness in the year in which the foreclosure sale became
final (1987, pursuant to our analysis supra).

A foreclosure sale constitutes a sale for tax purposes.
Helvering v. Hammel, 311 U.S. 504 (1941).  The amount realized
from a foreclosure sale includes the amount of liabilities "from
which the transferor is discharged as a result of the sale".
Sec. 1.1001-2(a)(1), Income Tax Regs.; see Crane v. Commissioner,
331 U.S. 1, 14 (1947); Aizawa v. Commissioner, 99 T.C. at 200-
201.  When debt is discharged in a foreclosure sale, tax
consequences may vary depending upon whether the discharged debt
is recourse or nonrecourse.  In the case of nonrecourse debt, the
amount realized on the foreclosure sale includes the entire

amount of debt discharged.  See, e.g., Commissioner v. Tufts, supra.  In the case of recourse debt, on the other hand, the amount realized generally equals the net proceeds received from the foreclosure sale rather than the entire recourse liability.[34] Aizawa v. Commissioner, supra; cf. Chilingirian v. Commissioner, 918 F.2d 1251 (6th Cir. 1990) (amount realized from foreclosure sale included amount of recourse debt discharged, where the discharge was closely related to the foreclosure sale), affg. T.C. Memo. 1986-463 .

Whether the partnership's debt was nonrecourse is properly determined at the partnership level in this TEFRA proceeding. See Hambrose Leasing 1984-5 Ltd. Pship. v. Commissioner, 99 T.C. 298, 308 (1992); sec. 301.6231(a)(3)-1(a)(1)(v), Proced. & Admin. Regs.  Indebtedness is generally characterized as "nonrecourse" if the creditor's remedies are limited to particular collateral for the debt and as "recourse" if the creditor's remedies extend to all the debtor's assets.  Raphan v. United States, 759 F.2d 879, 885 (Fed. Cir. 1985).  For indebtedness incurred by a partnership, Treasury regulations that were in effect at relevant times defined a nonrecourse liability as one with respect to

---

[34] Thus, the characterization of discharged debt as recourse or nonrecourse may affect the character of any gain or loss on the transaction.  In this proceeding, the parties have presented no issue as to the character of any gains realized by the partnership.

which "none of the partners have any personal liability".[35]   Sec.
1.752-1(e), Income Tax Regs.; see 1 McKee et al., Federal
Taxation of Partnerships and Partners, par. 8.02, at 8-6 (3d ed.
1997).

Pursuant to the terms of the loan guarantee agreement, DOE's
recovery on any claim was limited to the partnership's assets and
to the partners' interests in those assets.   Pursuant to the
indenture of mortgage for the loan guarantee agreement, the
collateral for the debt included all project assets, including
all real or personal property "now owned or hereafter acquired
by" the partnership.   Insofar as the record reveals, the
partnership had no significant assets apart from the project
assets that were foreclosed upon.   Indeed, pursuant to the
partnership agreement and loan guarantee agreement, the
partnership was not authorized to acquire nonproject assets or to
engage in any business other than the project.   After DOE took
control of the project and acquired the project assets, there was

---

[35] In support of his argument that the debt was nonrecourse,
respondent cites, without elaboration, current Income Tax Reg.
sec. 1.752-1(a)(2).   This regulation provides that, for purposes
of allocating a partnership's liabilities among its partners, "A
partnership liability is a nonrecourse liability to the extent
that no partner or related person bears the economic risk of loss
for that liability".   These regulations are generally effective
for liabilities incurred after Dec. 28, 1991.   Sec. 1.752-5(a),
Income Tax Regs.   The predecessor temporary regulations, which
were similar to the final regulations in this regard, were
generally effective for liabilities incurred on or after Jan. 30,
1989.   T.D. 8274, 1989-2 C.B. 101.   Accordingly, the regulations
cited by respondent were not in effect at any time relevant to
this case.

no realistic possibility that the partnership was going to acquire additional assets.[36]  In these circumstances, the partnership's liability on the debt was effectively limited to the project assets that collateralized the indebtedness, and the partners' liabilities were effectively limited to their interests in those project assets.  In these circumstances, the debt was in substance nonrecourse against the partnership and the partners.  We do not believe that the partners should be considered to have had any personal liability for the partnership's debt within the meaning of the then-applicable regulations.[37]

This conclusion is consistent with the manner in which the partnership treated the debt on its 1987 Form 1065.  The partnership reported disposing of the project assets in a "partial foreclosure sale" on November 2, 1987.  The partnership treated the $1 billion foreclosure sale price as "the amount of the taxpayer's nonrecourse indebtedness that was discharged as a result of the disposition of certain assets by the foreclosure

---

[36] Under the partnership agreement, partners were required to make capital contributions to the partnership only as directed by the management committee for the purpose of purchasing project assets and paying project costs and other costs incurred by the partnership.  The partners were prohibited from making voluntary contributions to the partnership.  The record does not suggest the partnership ever acquired additional assets after the project assets were transferred to DOE.

[37] Petitioner has not raised, and accordingly we do not consider, any argument that the partnership's debt should be considered recourse by virtue of ANRC's pledge of its ANG stock.

sale" (emphasis added).[38]  Petitioner has offered no reason why this characterization by the partnership of its indebtedness as nonrecourse should be disregarded here.

Instead, petitioner contends that it is immaterial whether the debt is considered to be recourse or nonrecourse, because even if it were nonrecourse, only $1 billion of the debt was extinguished in the foreclosure sale.[39]  Petitioner notes that the debt was directly secured by the ANG stock which ANRC had pledged and that DOE did not acquire the pledged stock and release the remaining debt until October 1988.  Consequently, petitioner contends, whether the debt is considered to be recourse or nonrecourse, the amount realized on the foreclosure sale should not exceed the $1 billion of the partnership's debt actually discharged at the time of the foreclosure sale.

---

[38] An opinion letter, dated Dec. 16, 1986, provided to Coastal Corp. (which had purchased ANRC) by the law firm of Fulbright & Jaworksi, stated that the amount realized by the partnership upon the foreclosure sale "would include the outstanding amount of the Partnership's indebtedness to the DOE. Commissioner v. Tufts, 461 U.S. 300 (1983)."

[39] At various places in its 202-page opening brief and 102-page reply brief, with little analysis and no citation of authority and without acknowledging that the partnership treated the debt as nonrecourse, petitioner asserts that the liability was recourse.  That assertion, however, does not appear in the 2-page section of petitioner's opening brief or the 3-page section of petitioner's reply brief specifically addressing the timing of the discharge of the partnership's indebtedness.

We disagree.  Whether a debt has been discharged is dependent on the substance of the transaction and not mere formalisms.  Cozzi v. Commissioner, 88 T.C. at 445.

> The moment it becomes clear that a debt will never have to be paid, such debt must be viewed as having been discharged.  The test for determining such moment requires a practical assessment of the facts and circumstances relating to the likelihood of payment. * * *  Any "identifiable event" which fixes the loss with certainty may be taken into consideration.  * * * [Id.]

See also Friedman v. Commissioner, 216 F.3d 537, 546 (6th Cir. 2000), affg. T.C. Memo. 1998-196; Brountas v. Commissioner, 74 T.C. 1062, 1073 (1980).  The conclusion of the foreclosure litigation was the identifiable event whereby it became clear that the partnership's debt would never be repaid by the partnership.  Indeed, according to petitioner's own representation, DOE bid only $1 billion in the foreclosure sale, rather than the entire amount of the debt, "precisely so that it would retain the ability separately to acquire the remaining collateral", the ANG stock, from ANRC.  Petitioner thereby implicitly acknowledges that DOE had no intention of attempting to recover any part of the remaining debt from the partnership. Subsequent events bear out that conclusion.  Insofar as the record reveals, DOE never made any other claims against the partnership for the debt.  In October 1988, when DOE reached the settlement agreement with ANRC, it discharged all the remaining debt in exchange for the ANG stock even though, as stated in the

settlement agreement, the value of the ANG stock was less than the debt balance.

Petitioner's reliance upon Aizawa v. Commissioner, 99 T.C. 197 (1992), is misplaced. Aizawa held that where an unpaid deficiency judgment on a recourse debt survived the foreclosure sale, and there was a "clear separation" between the foreclosure sale and the unpaid recourse liability which survived the foreclosure sale, the amount realized under section 1001(a) equaled the foreclosure sale price rather than the full unpaid mortgage principal. By contrast, in the instant case, as previously discussed, the partnership's and the partners' liabilities were effectively limited to the partnership's project assets that collateralized the indebtedness. Consequently, then, these liabilities did not survive the foreclosure sale, since DOE acquired all the partnership's project assets in the foreclosure sale. Insofar as the record reveals, DOE neither sought nor obtained any deficiency judgment against the partnership or any partner for the debt balance remaining after the foreclosure sale.

In sum, we conclude and hold that the partnership must take into account the full amount of the $1.57 billion debt as the amount the partnership realized upon disposition of the project assets upon the conclusion of the foreclosure litigation on November 2, 1987. See Commissioner v. Tufts, 461 U.S. 300 (1983).

In light of the foregoing,

<u>Decision will be entered</u>

<u>pursuant to Rule 155</u>.